UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

BARRY GIBBS,                          :
                                      :
         Petitioner                   :
                                      :
                                      :
    v.                                : CIVIL NO. 3:CV-08-0462
                                      :
ROBERT SHANNON,                       : (Judge Kosik)
                                      :
         Respondent                   :

FILED
SCRANTON

OCT 2 5 2013

PER_____
DEPUTY CLERK

## MEMORANDUM

Petitioner, Barry Gibbs ("Petitioner"), a Pennsylvania state inmate, initiated

this action with the filing of a petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. In the petition, he challenges his 2005 convictions for the third-degree

murder of George Mehl, criminal conspiracy to kill Mehl, criminal conspiracy to

commit aggravated assault against Wayne Burke, and the aggravated assault of

Burke.

I.    **Relevant Facts**[1]

On March 29, 1984, Petitioner was charged in connection with a shooting

incident that occurred on March 27, 1984. Sharon Burke solicited Petitioner to kill

---

[1] Specific facts with respect to each of the grounds raised in the petition will be
set forth in the Discussion section of this Memorandum pertaining to each ground.

her husband, Wayne Burke, who worked as a security guard at a Pike County, Pennsylvania housing development. She promised Petitioner money, a leather jacket and either a boat or a motorcycle, if he carried out the murder. On the evening of March 27, 1984, Mr. Burke was at work with George Mehl, another security guard. Petitioner went to that office at approximately 10:30 p.m. with Sharon Burke and three others (Sharon's daughter Bonnie Hagan, Wayne Burke's daughter Betsy Burke, and Bonnie's friend Jennifer Dean). Petitioner approached the window of the security office armed with a .357 Magnum handgun and fired six shots at the men through a window pane and screen. None of the shots struck Mr. Burke, but Mr. Mehl was killed by a gunshot wound to the head.

## II.    Procedural history

On March 29, 1984, Petitioner was charged with criminal homicide, criminal attempt to commit criminal homicide, criminal conspiracy, and aggravated assault for shooting and killing George Mehl and attempting to kill Wayne Burke on March 27, 1984. During his jury trial, Petitioner presented the testimony of Dr. Anthony J. Turchetti in support of insanity, as well as diminished capacity defenses, while the Commonwealth rebutted those defenses with the testimony of state psychiatrist Dr. Robert Sadoff. Petitioner was convicted of the first degree murder of Mehl, criminal attempt to commit homicide with respect to Mehl, criminal conspiracy to commit homicide with respect to Burke, criminal conspiracy to commit homicide with respect

to Mehl, criminal conspiracy to commit homicide with respect to Burke, and the aggravated assault of Burke. Petitioner was sentenced to death on the murder conviction. With respect to the other charges, he was sentenced to consecutive periods of incarceration of 5-10 years for criminal attempt to commit criminal homicide (Burke) and 5-10 years of incarceration for criminal conspiracy to commit criminal homicide (Burke). The Pennsylvania Supreme Court ultimately reversed the convictions based upon the erroneous admission at trial of an inculpatory statement made by Petitioner, and granted him a new trial. See Commonwealth v. Gibbs, 553 A.2d 409 (Pa. 1989), cert. denied Pennsylvania v. Gibbs, 493 U.S. 963 (1989).

On February 10, 1994, Petitioner's second jury trial began. Dr. Sadoff again testified about incriminating statements Petitioner had made to him during the course of his psychiatric examination of Petitioner. He was found guilty of the third-degree murder of Mehl, criminal conspiracy to commit homicide (Mehl), criminal conspiracy to commit homicide (Burke), and the aggravated assault of Burke. The charge of criminal attempt to commit homicide was not submitted to the jury during this trial. Petitioner was sentenced to consecutive periods of incarceration of 5-10 years for third-degree murder, 5-10 years for both counts of criminal conspiracy (to run concurrently with each other), and 10-20 years incarceration for aggravated assault. The total sentence in all amounted to 20-40 years.

On direct appeal, the Pennsylvania Superior Court affirmed in part, reversed in

part, and remanded the case to the trial court for resentencing on the aggravated assault charge. See Commonwealth v. Gibbs, 676 A.2d 281 (Pa. Super. 1995). A petition for allowance of appeal was denied by the Pennsylvania Supreme Court on August 12, 1996. See Commonwealth v. Gibbs, 680 A.2d 1159 (Pa. 1996). Petitioner was resentenced on October 24, 1996, to 5-10 years incarceration on the aggravated assault conviction.

A pro se PCRA petition under the Pennsylvania Post Conviction Relief Act was filed by Petitioner on July 24, 1997.[2] Counsel was appointed to represent Petitioner and an amended PCRA petition and a supplement thereto were filed on his behalf. The trial court denied the petitions on July 13, 1998, and this decision was affirmed by the Superior Court. See Commonwealth v. Gibbs, 738 A.2d 1050 (Pa. Super. 1999). A petition for allowance of appeal was denied. See Commonwealth v. Gibbs, 742 A.2d 168 (Pa. 1999).

Petitioner thereafter filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this court. (See Gibbs v. Frank, No. 3:CV-99-1627 (M.D. Pa. 2002)). The petition was denied on September 30, 2002. In the petition, twenty-seven (27) grounds were raised including ineffective assistance of counsel, trial court error, challenges to jury instructions, sentencing challenges and prosecutorial misconduct. The Third Circuit Court of Appeals granted Petitioner a new trial on the

---

[2] See 42 Pa.C.S. § 9541 et seq.

ground that the testimony of the Commonwealth's psychiatrist, Dr. Sadoff, was introduced improperly in violation of Petitioner's Fifth Amendment right against self-incrimination. See Gibbs v. Frank, 387 F.3d 268 (3d Cir. 2004). Following remand, this court ordered on November 18, 2004 that Petitioner be retried within 120 days.[3]

The third jury trial commenced on June 23, 2005. Petitioner was again convicted of third degree murder, two counts of conspiracy, and aggravated assault. He was sentenced to twenty-five (25) to fifty (50) years imprisonment.

On direct appeal, the Pennsylvania Superior Court affirmed the conviction and sentence on February 14, 2007. See Commonwealth v. Gibbs, No. 2800 EDA 2005, 924 A.2d 691 (Pa. Super. 2007). A petition for allowance of appeal was denied on December 18, 2007, by the Pennsylvania Supreme Court. See Commonwealth v. Gibbs, No. 415 MAL 2007, 939 A.2d 889 (Pa. 2007).

The pending petition for writ of habeas corpus was filed on March 12, 2008. In the petition, the following five (5) grounds are raised:

1.  Trial court erred in permitting the Commonwealth to introduce un-Mirandized statements made to psychiatrist at pretrial examinations as proof of guilt when the defense did not raise issue of sanity. (Violation of 5th, 6th and 14th Amendments)

2.  Trial court violated bar of collateral estoppel by allowing prosecution to introduce testimony and evidence of specific intent

---

[3] Petitioner later moved for his release due to the alleged violation of this order by the Commonwealth. The motion was denied by this court on April 27, 2006, and Petitioner's appeal to the Third Circuit was unsuccessful. See Gibbs v. Frank, 500 F.3d 202 (3d Cir. 2007), cert denied 128 S.Ct. 1236 (2008).

to kill at Petitioner's third trial and sentencing after the jury at his second trial made a determination that there was no specific intent. (Violation of 5th and 14th Amendments)

3. Trial court violated the law of the case doctrine in that it permitted the prosecution to introduce an alleged confession, without any new evidence, which the Pennsylvania Supreme Court had previously held was violation of Miranda v. Arizona. (Violation of 5th, 6th and 14th Amendments)

4. Petitioner was improperly convicted and sentenced twice for a single conspiracy. (Violation of 5th and 14th Amendments)

5. Trial court punished Petitioner for having filed a successful habeas petition by increasing his sentence by 5 to 10 years after his third trial. (Violation of 5th and 14th Amendments)

(Doc. 1, Pet. at 5-6.)[4]

## III. Standard of Review

### A. Exhaustion

Before a federal court can review the merits of a state prisoner's habeas petition, it must determine whether the petition has met the requirements of exhaustion. Relief cannot be granted unless all available state remedies have been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant. See 28 U.S.C. § 2254(b)(1). The exhaustion requirement is grounded on principles of comity in order to ensure that state courts have the initial opportunity to

---

[4] In citing to the record, the court will refer to the page numbers of each document in the docket as assigned by the Official Court Electronic Document Filing System (CM/ECF).

review federal constitutional challenges to state convictions. See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

To satisfy the exhaustion requirement, a federal habeas petitioner must have presented the facts and legal theory associated with each claim through "one complete round of the State's established appellate review process."[5] O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999); see also Holloway v. Horn, 355 F.3d 707, 714 (3d Cir. 2004). The exhaustion requirement is satisfied if a petitioner's claims are either presented to the state courts directly on appeal from the judgment of sentence, or through a collateral proceeding, such as a PCRA petition. Swanger v. Zimmerman, 750 F.2d 291, 195 (3d Cir. 1984). It is not necessary for a petitioner seeking federal habeas relief to present his federal claims to state courts both on direct appeal and in a PCRA proceeding. Id. However, a petitioner is not deemed to have exhausted the remedies available to him if he has a right under the state law to raise, by any available procedure, the question presented. 28 U.S.C. § 2254(c); Castille v. Peoples, 489 U.S. 346, 350 (1989). The petitioner bears the burden of demonstrating that he has satisfied the exhaustion requirement. Lines v. Larkins, 208 F.3d 153, 159 (3d

---

[5] Pursuant to Pennsylvania Supreme Court Order 218, effective May 9, 2000, issues presented to the Pennsylvania Superior Court are considered exhausted for the purpose of federal habeas corpus relief under Section 2254. *See In re: Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, No. 218, Judicial Administration Docket No. 1 (May 5, 2000)(per curiam). As such, petitioners are not required to seek review from the Pennsylvania Supreme Court in order to give the Pennsylvania courts a "full opportunity to resolve any constitutional claims." Lambert v. Blackwell, 387 F.3d 210, 233 (3d Cir. 2004).

Cir. 2000)(citing <u>Lambert v. Blackwell</u>, 134 F.3d 506, 513 (3d Cir. 1997)).

Beyond questions of exhaustion, a federal court may be precluded from reviewing claims under the "procedural default doctrine." <u>Gray v. Netherland</u>, 518 U.S. 152, (1996); <u>Coleman v. Thompson</u>, 501 U.S. 722, 732 (1991); <u>Doctor v. Walters</u>, 96 F.3d 675 (3d Cir. 1996). The purpose of the procedural default rule is to prevent habeas petitioners from avoiding the exhaustion doctrine by defaulting their claims in state court. <u>Coleman</u>, 501 U.S. at 732.

A state's procedural rules are entitled to deference by federal courts; a petitioner's violation of a state procedural rule may constitute an independent and adequate state law ground for denial of federal review of habeas claims under the procedural default doctrine. <u>Id</u>. at 750. Moreover, violations of a state's procedural rules may constitute an independent and adequate state ground sufficient to invoke the procedural default doctrine even where no state court explicitly has concluded that a petitioner is procedurally barred from raising his claims. <u>Glass v. Vaughn</u>, 65 F.3d 13, 15 (3d Cir. 1995), <u>cert. denied</u>, 516 U.S. 1151 (1996). However, the procedural default doctrine only applies when a state procedural rule is consistently or regularly applied. <u>Banks v. Horn</u>, 126 F.3d 206, 211 (3d Cir. 1997)(quoting <u>Johnson v. Mississippi</u>, 486 U.S. 578, 588-89 (1988))[6]. A petitioner whose

---

[6] <u>See</u> <u>also</u> <u>Doctor</u>, 96 F.3d at 675 (the state rule must be firmly established and regularly followed before it can be considered an independent and adequate state law ground sufficient to foreclose federal court review under the procedural default doctrine).

constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either: (1) "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law; or (2) failure to consider the claims will result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750; see also Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wenger v. Frank, 266 F.3d 218, 223 (3d Cir. 2001); Lines, 208 F.3d at 166.

The United States Court of Appeals for the Third Circuit has instructed that a petition containing exhausted and unexhausted but procedurally barred claims is not a mixed petition requiring dismissal under Rose v. Lundy, 455 U.S. 509 (1982). See Wenger, 266 F.3d at 227. Instead, the Court of Appeals held that the district court should review the merits of the exhausted claims, but must not decide the merits of the claims that are barred under the procedural default doctrine. Id.

### B. Merits

In addressing claims in a habeas petition filed pursuant to 28 U.S.C. § 2254, this court can only grant relief for violations of federal law, not state law. Swarthout v. Cooke, ___ U.S. ___, ___, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011). Habeas review of the state courts' resolution of Petitioner's claims is governed by 28 U.S.C. § 2254(d)(1) and (d)(2). Under subsection (d)(1), the court may grant the writ if the state courts' adjudication of the claims was contrary to clearly established Supreme

Court precedent or an unreasonable application of that precedent. A state court judgment is "contrary to" Supreme Court precedent when it is "diametrically different, opposite in character or nature, or mutually opposed" to "clearly established" decisions of the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). "A state-court decision will also be contrary to" Supreme Court "precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the] precedent." Id. at 406, 120 S.Ct. 1519-20.

"[A] state court ruling is considered an 'unreasonable application' if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refused to extend the principle to a new context where it should apply." McMullin v. Tennis, 562 F.3d 231, 236 (3d Cir. 2009)(cited cases omitted). "The unreasonable application test is an objective one - a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)(cited cases omitted). If "'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief cannot be granted. Harrington v. Richter, ___ U.S.___, ___, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011)(quoted case omitted).

Under subsection (d)(2), this court may grant the writ if the state courts' adjudication of the claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "A state court decision is based on 'an unreasonable determination of the facts' only if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding.'" Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013)(quoted case omitted), cert denied, 2013 WL3489415 (Oct. 13, 2013). State-court fact finding "is presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." Id.

## IV. Discussion

### A. Trial Court error in allowing Commonwealth to introduce testimony from Dr. Turchetti

#### 1. Relevant facts

The following facts with respect to this issue are extracted from the opinion of the Pennsylvania Superior Court with respect to Petitioner's direct appeal from his September 1, 2005 judgment of sentence:

On June 22, 1984, prior to his first trial, Appellant filed a notice that he intended to pursue a mental infirmity or insanity defense. On October 19, 1984, Appellant filed a petition requesting a psychiatric examination. It is evident that the sole reason for the petition was to obtain a court order requiring the Commonwealth to pay for the doctor's services. Specifically, the petition asked that the court order that the

Appellant be **authorized** *in forma pauperis* to be examined
by Dr. Anthony Turchetti of 165 East Eighth Street,
Wyoming, Pennsylvania for the purpose of determining
whether the Defendant: (a) is competent to stand trial and
assist in the preparation of his defense, and (b) had the
capacity to commit the crime with which he is charged.

Petition for Examination, 10/19/84, at ¶ 7. The petition further stated
that Appellant "feels that it is necessary to have the aforementioned
examination(s) performed in order to prepare his defense." Id. at ¶ 10.

As a result, the trial court entered an order authorizing the defense
to retain Dr. Turchetti at the expense of the Commonwealth. The order
did not compel a psychiatric examination over the objection of
Appellant:

AND NOW, to wit, this 19th day of October, 1984 in light of the
serious charges against the Defendant, and the within Petition, the
Defendant is authorized in forma pauperis to be examined by Dr.
Anthony Turchetti of 165 East Eighth Street, Wyoming, Pennsylvania
18642 for the purpose of determining whether the Defendant: (a) is
competent to stand trial and assist in the preparation of his defense, and
(b) had the capacity to commit the crime with which he is charged. In
addition, Dr. Turchetti's report should indicate any and all psychological
or emotional disorders or defects from which the Defendant suffers and
the appropriate treatment for said disorders or defects. The expense of
said examination to be borne by the County of Pike, and the record of
said examination to be sealed and inadmissible by the Commonwealth at
trial. The date of said examination to be Friday, October 19, 1984.

Trial Court Order, 10/19/84, at 1.

Dr. Turchetti was then presented by Appellant as a witness in his
defense at the first trial in this matter. At the inception of his testimony,
Dr. Turchetti indicated that the psychiatric examination he had
performed was done at the request of Appellant. During the course of
his direct examination by Appellant's counsel, Dr. Turchetti recounted
the facts of the crime and delved into many incrimination statements
made by Appellant to him during the course of his examination. Dr.
Turchetti indicated that at the beginning of the examination, Appellant

was aware that "he was supposed to have been paid by a woman to, . . . 'To knock off her husband.'" N.T. Trial, 12/10/1984, at 256. Appellant was aware that the husband's murder "never happened" and explained, "'I got the wrong guy.'" **Id**.

Dr. Turchetti continued as follows on direct examination:

In the year or so preceding the alleged crime of which he stands charged he began to become involved with Satanism, Satanic beliefs.

Q. What did he say with regard to that?

A. Well, I was trying to get his understanding of that. He told Mehl he was a Devil worshipper, and as a Devil worshipper, he believed that he had to violate all the rules of man, the rules of law, and to devote his life to the pleasurable things, and so violating the law and living on the pleasures of alcohol and drugs and sex was his Satanic belief, and I asked him, "Well, you know, did you commit crimes in this Satanic belief." He said, "Well, I had done everything except murder to the time of this alleged crime in March." So that's where he stood on his Satanic beliefs.

I then proceeded to ask more about the night in question.

**Id.** at 257.

Dr. Turchetti explained that Appellant's memory of the night was incomplete because Appellant had ingested the hallucinogenic drug LSD and was drinking alcohol. Appellant recalled going into Honesdale and then to a friend's house.
Dr. Turchetti then was asked by Appellant's counsel how Appellant described the events of March 27, 1984 to the doctor, and Dr. Turchetti responded:

> He said, "I didn't think about actually going over and wasting somebody, but there was nothing I could do about it. There was nothing I could do. I was standing there. There was no stopping. It was like I was actually controlled by the Devil. I could actually see myself doing it. I was standing in back of my back watching me shoot. Then there

13

was a click that brought me back to reality because the click came after I had shot the gun. It was like a flash. Afterwards I was thinking about it. I figured I had wasted two guys. My heart was pounding. I don't know if I slept. I went to work the next day. I didn't think about it. I thought it was a bad trip, a major hallucination. I didn't think I had actually done it."

**Id.** at 258-59. Dr. Turchetti delineated that Appellant did not believe the murder was wrong but "believed to commit crimes was what Satan was preaching. Therefore, [the shooting] was right as a Satanist . . . . So [Appellant] believed it was the right thing to do." **Id.** at 267.

Dr. Turchetti opined that the following factors prevented Appellant from forming the specific intent to kill: 1) these Satanic beliefs; 2) Appellant's psychiatric disorders of impulse control, depression, and antisocial personality; 3) his history of drug and alcohol consumption; and 4) his ingestion of drugs and alcohol on the night of the shooting.

At Appellant's second trial, Appellant again called Dr. Turchetti as a witness, and Dr. Turchetti repeated the testimony described above, establishing a diminished capacity defense once again. The trial court instructed the jury that voluntary intoxication was a defense to first degree murder. N.T., 2/17/94, at 1105-06. The trial court augmented this instruction with the admonition that the Commonwealth had the burden of disproving the voluntary intoxication or drugged condition defense to first degree murder. **Id.** at 111. When the jury requested a repeat instruction on the elements of the offenses, the court included the admonition that voluntary intoxication or a drugged condition could negate the specific intent to kill. N.T., 2/18/94, at 1145. Later, the jury asked the court to repeat specifically the differences between first degree murder and third degree murder. After reviewing the elements of the two offenses, the court repeated, "The defendant is permitted to claim as a defense that he was so drunk or intoxicated or drugged at the time of the killing that he did not possess the specific intent to kill required for first degree murder, as I have been telling you about. The Commonwealth has the burden of disproving this defense." **Id.** at 1161. Thirty minutes later, the jury returned a verdict of third degree murder, acquitting Appellant of first degree murder.

At Appellant's third trial, over a defense objection, the Commonwealth introduced, through the testimony of Dr. Turchetti, Appellant's admissions regarding the facts of the crime made during his examination by that doctor. The testimony of Dr. Turchetti was identical to his testimony at the first and second trials.

(Doc. 31-44 at 5-9, Pa. Super. Ct. Op. dated 2/14/07.)

2.    Petitioner's challenge under the Pennsylvania Mental Health Procedures Act ("MHPA")

In listing his challenges in the pending habeas corpus petition with respect to the testimony of Dr. Turchetti, Petitioner does not specifically reference the MHPA, 50 P.S. § 7401, et seq. However, because he does address the MHPA in his supporting memorandum, the court will assume he intends to raise as a ground that the admission of Turchetti's testimony violated the MHPA.

The MHPA, in relevant part, provides as follows:

§ 7402.  Incompetence to proceed on criminal charges and lack of criminal responsibility as defense

.    .    .    .

(e)  Conduct of Examination; Report.—When ordered by the court, an incompetency examination shall take place under the following conditions:

.    .    .    .

(3) The person shall be entitled to have counsel present with him and shall not be required to answer any questions or to perform tests unless he has moved for or agreed to the examination. Nothing said or done by such person during the examination may be used as evidence against him in any criminal proceedings on any issue other than that of his mental condition.

50 P.S. § 7402(e)(3).

15

In addressing this claim on direct appeal, the Pennsylvania Superior Court questioned whether the statute even prohibits Turchetti's testimony for the following reasons. First, the petition presented to the trial court was not a request for a court-ordered examination for purposes of establishing Petitioner's competency to stand trial, but rather he was seeking to develop insanity and diminished capacity defenses for use at trial. Furthermore, it is questionable whether the examination conducted by Turchetti can even be characterized as "court-ordered." Petitioner had already secured Turchetti's services when he filed the petition, and he filed the petition in order to obtain approval for payment of Turchetti's services by Pike County. More importantly, at both his first and second trial, it was Petitioner himself who presented Turchetti's testimony on a question not even related to competency. Rather, Turchetti conceded that Petitioner was competent, and then established the existence of insanity and diminished capacity defenses. Turchetti's testimony resulted in Petitioner's acquittal on first degree murder and spared him from the death penalty or life imprisonment. (Doc. 31-44, Pa. Super. Op. at 10.)

Based on the above, the Superior Court relied upon an independent and adequate state law ground to dispose of the MHPA claim. Specifically, the state court found that Petitioner waived any protection afforded by 50 P.S. § 7402 in that Turchetti did not conduct an "incompetency examination" that was "ordered by the court." Rather, Petitioner secured the services of Turchetti prior to even presenting

his petition to the trial court and he presented the petition in order to obtain approval for payment of Turchetti's services. Moreover, Petitioner voluntarily presented the testimony of Dr. Turchetti during his first two trials in his case-in-chief.

In addition, Respondent argues that this MHPA ground should be dismissed on procedural grounds due to Petitioner's failure to frame it as a federal claim. It is well established that the misapplication by a state of its own law does not generally raise a constitutional issue, and therefore is not properly before this court. See Taylor v. Horn, 504 F.3d 416, 448 (3d Cir. 2007). Respondent further maintains that Petitioner failed to fairly present any such claim to the state courts as a federal claim and, therefore, any such claim is procedurally defaulted. A petitioner has fairly presented his claim if he presents the same factual and legal basis for the claim to the state courts and (1) relies on pertinent federal cases; (b) relies on state cases employing constitutional analysis in like factual situations; (c) asserts the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) alleges a pattern of facts that is within the mainstream of constitutional litigation. McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999). In reviewing the state court record, it is clear that Petitioner framed any issued with respect to the MHPA in terms of state law, and failed to present his claim as a federal issue. No cause or prejudice has been asserted in support of this procedural default. For all of these reasons, any claim by Petitioner under the MHPA is subject to dismissal.

3.  Petitioner's Fourteenth Amendment Due Process challenge

Petitioner raises a due process objection to the Commonwealth's use of Dr. Turchetti's testimony on the basis of due process. Specifically, he contends that the use of Dr. Turchetti's testimony placed him in the "constitutionally infirm position of having to exercise his due process right to seek out an insanity defense at the expense of his Fifth Amendment right against self-incrimination." (Doc. 2 at 6.)

In analyzing this claim, the Pennsylvania Superior Court relied on <u>Keller v. Larkins</u>, 251 F.3d 408, 413 (3d Cir. 2001), which held that an error in an evidentiary ruling will be considered a due process violation when the error undermined the "fundamental fairness" of the entire trial. In analyzing Petitioner's claim, the Superior Court found that Petitioner did not merely "seek out" Dr. Turchetti's testimony, he chose to present such testimony in the first instance at two trials. Had Petitioner only explored the defense by consulting with Turchetti and then opted not to use him as a witness, the Commonwealth would not have been permitted to introduce Turchetti's evidence. The state court found that the fact that Petitioner's trial counsel chose to pursue a successful diminished capacity defense rather than deny culpability did not place Petitioner in a constitutionally untenable position. Petitioner retained Dr. Turchetti, and then chose to proffer his testimony at two trials.

The clearly established federal law applicable in addressing Petitioner's argument that the admission of this evidence rose to a denial of due process is that the

18

admission "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). The Pennsylvania Superior Court applied the proper legal standard as set forth by the Third Circuit Court of Appeals in the Keller case. The rejection of Petitioner's claim by the state court was not "contrary to" or an "unreasonable application of" this clearly established federal law. The admissions made by Petitioner were clearly probative. While also incriminating, the statements referenced Satanism and drug use as underlying causes leading to the killing, and these causes were the ultimate basis for his successful diminished capacity defense during the second trial resulting in his acquittal of first degree murder.

Moreover, the state court's finding that any argument by Petitioner that he was forced to choose between exercising his right against self-incrimination during his interview with Turchetti and his right to pursue a diminished capacity defense as meritless cannot be found to be unreasonable. Petitioner's interview with Dr. Turchetti was not compelled by the government, as more fully discussed in the next section addressing Petitioner's Fifth Amendment challenge.

Further, Petitioner does not point to any "clearly established Federal law, as determined by the Supreme Court of the United States" that holds it is fundamentally unfair and a violation of due process for the government to introduce into evidence in a retrial, a criminal defendant's confession to his mental health expert when that

confession was voluntarily presented by the Petitioner in his case-in-chief during a

prior trial. For these reasons, this court finds Petitioner's due process challenge to be

without merit.

4. Petitioner's challenge under Fifth Amendment right against self-incrimination

Petitioner argues that his privilege against self-incrimination under the Fifth

Amendment was violated when the Commonwealth was permitted to call Dr.

Turchetti to testify as to statements made to him by Petitioner because the statements

were incriminating, testimonial and compulsory. In addressing this claim, the

Pennsylvania Superior Court relied upon the following United States Supreme Court

precedent:

> As the United States Supreme Court observed, "The Fifth Amendment
> states that '[n]o person . . . shall be compelled in any criminal case to be
> a witness against himself.' To qualify for the Fifth Amendment privilege,
> a communication must be testimonial, incriminating, and compelled."
> Hiibel v Sixth Judicial District Court of Nevada, 542 U.S. 177, 189
> (2004). Accordingly, the Court "has held repeatedly that the Fifth
> Amendment is limited to prohibiting the use of 'physical or moral
> compulsion' exerted on the person asserting the privilege." Fisher v.
> United States, 425 U.S. 391, 397 (1976).

(Doc. 31-44 at 14, Pa. Super. Op.) In finding that neither Petitioner's examination by

Turchetti, nor his decision to present the results of that examination at first two trials,

were compelled, the Superior Court relied upon the Supreme Court precedent

summarized by the Third Circuit Court of Appeals in addressing Petitioner's direct

appeal following his second trial. Specifically, the Third Circuit prohibited the

20

Commonwealth from introducing Petitioner's inculpatory statements made during a compelled psychiatric examination by a <u>prosecution-retained expert witness</u> when the examination was ordered <u>pursuant to a government request</u> because Petitioner had indicated that he intended to pursue diminished capacity and insanity defenses. The Third Circuit specifically relied upon the fact that the interview with the Commonwealth's psychiatrist was mandated by the state court and that the doctor was the "state selected doctor." See <u>Gibbs v. Frank</u>, 387 F.3d 268, 275 (3d Cir. 2004) (emphasis added.) While the Fifth Amendment privilege under those circumstances was found to be waived only for purposes of rebutting the insanity and diminished capacity defenses, Petitioner's inculpatory statements establishing his guilt for the crime could not be used against him. <u>Id</u>. at 274. In fact, the Third Circuit noted that the "Fifth and Sixth Amendments do not necessarily attach, however, when the defendant himself initiates the psychiatric examination[.]" <u>Id</u>.

Based on the foregoing precedent, the Superior Court found, with respect to the instant Fifth Amendment challenge, that it was Petitioner who sought out the psychiatric examination by Dr. Turchetti and that the statements he made to Turchetti were introduced by Petitioner himself at two trials. As such, the state court found no Fifth Amendment violation to have occurred under these circumstances.

The Pennsylvania court's conclusion with respect to Petitioner's Fifth Amendment claim was not contrary to, or an unreasonable application of, clearly

established federal law as established by the United States Supreme Court. Not only did the state court apply the correct legal standard, but the court also relied upon a decision by the Third Circuit Court of Appeals interpreting Supreme Court cases to mean that the Fifth Amendment does not necessarily attach to statement made by a criminal defendant to a psychiatrist, if the defendant initiates the examination.

Further, this court is unable to conclude that the state court's rejection of Petitioner's Fifth Amendment claim was unreasonable. The statements made by Petitioner to Dr. Turchetti were not compelled, as evidenced by the petition submitted to the trial court and the trial court's order that Turchetti had been selected as a defense expert prior to the filing by Petitioner of his request seeking authorization for in forma pauperis status to retain Turchetti. In addition, Turchetti was never identified as court-appointed, the trial court's order did not require that a competency examination be performed, and Petitioner himself introduced the statements he made voluntarily to Turchetti during his case-in-chief in his first trial. For these reasons, the court finds this habeas challenge to be without merit.

5.    Petitioner's challenge under Sixth Amendment right to effective assistance of counsel

In his pending habeas petition, Petitioner claims that he was denied his Sixth Amendment right to effective counsel when the Commonwealth was permitted to call Dr. Turchetti to testify to the incriminating statements Petitioner made. Specifically, he claims that counsel was "not free to make an informed judgment as to whether

[Petitioner] should assert an insanity defense without worrying that any incriminating statements made by [Petitioner] might later be used against him. (Doc. 2 at 14.) The Pennsylvania Superior Court agreed with the Commonwealth that as this question of ineffectiveness had not been subjected to an evidentiary hearing, the state court was precluded from addressing its merits, and deferred the issue to the collateral review process. (Doc. 31-45 at 1, Pa. Super. Op.)

Because Petitioner never fairly presented this ineffective assistance of counsel claim to the Pennsylvania courts, Respondent argues that it is procedurally barred and subject to dismissal. Following the conclusion of direct review by the Pennsylvania Supreme Court on December 18, 2007, Petitioner had one (1) year to present any such ineffective assistance of counsel claim in a petition for collateral review under the Post Conviction Relief Act, 42 Pa.C.S. §9545(b). Petitioner never filed a PCRA petition subsequent to his third trial. As such, this claim is procedurally barred. See O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999). While a procedural default can be overcome by a demonstration of either: (1) "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law; or (2) failure to consider the claims will result in a "fundamental miscarriage of justice," Coleman, 501 U.S. at 750; see also Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wenger v. Frank, 266 F.3d 218, 223 (3d Cir. 2001), in his habeas petition, Petitioner has failed to come forth with a demonstration of either cause and prejudice or fundamental miscarriage

23

of justice.

**B. Trial court violated bar of collateral estoppel by allowing prosecution to introduce testimony and evidence of specific intent to kill after jury at second trial made determination that there was no specific intent**

1. Relevant facts

Petitioner argues that the doctrine of collateral estoppel barred the Commonwealth from introducing any testimony/evidence during his third trial that Petitioner had a specific intent to kill. He supports this position by arguing that because the jury in Petitioner's second trial convicted him of third degree murder, the jury had to have concluded that he had not formed a specific intent to kill. Specifically, he maintains that in convicting him of the third degree murder of Mehl, the jury necessarily rejected the Commonwealth's evidence that bore directly on the issue of intent, and found that he lacked the specific intent to kill. The evidence cited by Petitioner consisted of the following: (1) testimony from Bonnie Hagan and Betsy Burke that Sharon Burke hired Petitioner to kill Wayne Burke and George Mehl; (2) testimony from Dr. Turchetti that Petitioner intended to kill Burke in order to achieve "a complete set"; and (3) testimony from Debbie Meszler that Petitioner announced he was going to "waste someone." (Doc. 2 at 18.) According to Petitioner, if the jury in his second trial had accepted any of this testimony, they would have found specific intent to exist and convicted him of first degree murder.

Petitioner argues that the trial court denied his motion in limine prior to the

start of the third trial wherein he sought to prevent the Commonwealth from introducing the testimony/evidence referenced above with respect to specific intent. As a result, the Commonwealth was permitted to introduce this same evidence in the third trial. Petitioner suggests that double jeopardy bars the introduction of such evidence.

This issue was raised in Petitioner's direct appeal to the Pennsylvania Superior Court following the conclusion of the third trial. (Doc. 31-45 at 1, Pa. Super. Op.) In addressing Petitioner's claim, the Superior Court cited to the case of Commonwealth v. Cohen, 529 Pa. 552, 559, 605 A.2d 1212, 1216 (1992) in examining the doctrine of collateral estoppel as a component of double jeopardy. The Cohen case specifically relied upon the collateral estoppel standard as set forth in Ashe v. Swenson, 397 U.S. 436 (1970). In particular, the Superior Court's opinion provided as follows:

> In **Ashe v. Swenson**, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the United States Supreme Court held that collateral estoppel is an integral part of the Fifth Amendment guarantee against double jeopardy, and defined the term to mean that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." **Id.**, 397 U.S. at 443, 90 S.Ct. at 1194, 25 L.Ed.2d at 475. The Court indicated that the rule of collateral estoppel in criminal cases is to be applied
>
>> with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach

requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."

(Doc. 31-45 at 1-2, Pa. Super. Op.) The state court found that the collateral estoppel doctrine could be applied only if the following requirements were met: 1) the issues in the two actions are sufficiently similar and sufficiently material to justify invoking the doctrine; 2) the issue was actually litigated in the first action; and 3) a final judgment on the specific issue in question was issued in the first action. (Id. at 2.) In accordance with the instruction set forth in Cohen, the Superior Court examined the record of the second trial and took into account the pleadings, evidence, charge, and the verdict in order to determine whether the jury verdict at the second trial foreclosed any consideration of Petitioner's specific intent to kill.

In doing so, the state court found while Petitioner was acquitted of first degree murder as to Mr. Mehl, he was convicted of criminal conspiracy to commit homicide as to Mr. Burke. (Doc. 31-45 at 4, Pa. Super. Op.). At the second trial, the jury was instructed specifically that in order to convict Petitioner of that conspiracy, the Commonwealth was required to prove Petitioner possessed the intent to promote or facilitate the homicide of Burke. Thus, while the jury in the second trial found that on the night in question Petitioner was under the influence of drugs so as to render him

incapable of specific intent to murder Mehl, the jury nevertheless concluded that he did have the intent to kill Burke. (Doc. 31-45 at 4, Pa. Super. Op.)

At the third trial, Petitioner tried to prevent evidence regarding his specific intent to kill Burke, specifically 1) that he acted as a contract killer regarding the attempted murder of Burke; 2) Dr. Turchetti's testimony that he planned to kill Burke to achieve a complete set of bad acts to satisfy the devil; 3) that on the night of the murder, he stated to Commonwealth witness Debbie Meszler that he was going to kill someone; and 4) Bonnie Hagan's testimony that prior to the murder, Petitioner was rubbing his hands together in the back seat of the car in anticipation of killing someone. The state court found that all of this evidence related to the conspiracy to kill Mr. Burke, for which Petitioner was convicted at the second trial. As such, the trial court properly held that the jury ruling regarding his specific intent to kill Mr. Mehl did not preclude examination of this evidence relating to Mr. Burke because the second jury did convict Petitioner of conspiring to kill Mr. Burke. (Id. at 5.)

### 2. Analysis

In the instant case, the state courts applied the proper legal standard as set forth in Ashe v. Swenson, 397 U.S. 436 (1970) in rejecting Petitioner's claim. Moreover, Petitioner has not pointed to a Supreme Court case whose facts are materially indistinguishable from the present case that warrant habeas relief in his favor. In addition, it cannot be said that the Pennsylvania courts rejection of Petitioner's

collateral estoppel claim was unreasonable in light of the facts cited in the record .
The evidence which Petitioner sought to preclude was all evidence related to the
conspiracy to kill Burke, a crime of which Petitioner was convicted in the second
trial. For these reasons, the court finds this habeas claim to be without merit.

### C. Trial court violated the law of the case doctrine in allowing prosecution to introduce alleged confession, without any new evidence, which Pennsylvania Supreme Court previously held violated Miranda v. Arizona

#### 1. Relevant facts

Petitioner argues that statements he made to police, after the interrogation at
the police station was concluded, were improperly admitted at his third trial under the
law of the case doctrine because following the first trial, the Pennsylvania Supreme
Court in Commonwealth v. Gibbs, 520 Pa. 151, 553 A.2d 409 (1989), prohibited the
introduction of any of his statements[7]. With respect to this issue, the following facts
have been extracted from the Pennsylvania Superior Court's opinion on Petitioner's
direct appeal following his third trial:

> Initially, we discuss **Gibbs**. The decision in **Gibbs** "narrowly"

---

[7] As quoted by the Pennsylvania Superior Court in addressing Petitioner's
direct appeal, the rules comprising the law of the case doctrine are that: "(1) upon
remand for further proceedings, a trial court may not alter the resolution of a legal
question previously decided by the appellate court in the matter; (2) upon a second
appeal, an appellate court may not alter the resolution of a legal question previously
decided by the same appellate court; and (3) upon transfer of a matter between trial
judges of coordinate jurisdiction, the transferee trial court may not alter the resolution
of a legal question previously decided by the transferor trial court." Commonwealth
v. Starr, 541 Pa. 564, 664 A.2d 1326, 1331 (1995). (Doc. 31-45 at 6, Pa. Super. Op.)

focused on whether a police officer had improperly induced a confession at the police station when the officer responded to Appellant's question about whether consultation with a lawyer would aid him. **Id.** at 153, 553 A.2d at 410. Specifically, after being given his **Miranda** warnings, Appellant inquired as to whether consultation with a lawyer would aid him. The police officer answered that he did not know whether obtaining a lawyer would help in Appellant's defense but that the officer would tell the district attorney that Appellant had cooperated. Appellant thereafter confessed to killing Mr. Mehl. The **Gibbs** Court held that the police officers response to Appellant's request for a lawyer had improperly induced the confession because it had incorrectly created the implication that Appellant would benefit from foregoing the assistance of counsel. The Court ruled that the "interrogation" was poisoned and that the "inculpatory testimony given at the [police] barracks was infirm." **Id.** at 156, 553 A.2d at 411.

Before the beginning of Appellant's second trial, the Commonwealth sought to introduce statements that Appellant had made after the interrogation at the police barracks had ceased. In response, the trial court issued these findings of facts, which are supported by the evidence adduced at the suppression hearing:

1. Robert McDevitt was a State Trooper employed by the Pennsylvania State Police.

2. On March 29, 1984, at 9:30 a.m. Trooper McDevitt first came into contact with the Defendant at former Magistrate Dorothy Laabs' office.

3. The Defendant was then transported to the State Police Barracks.

4. At 11:45 a.m. the Defendant was read his **Miranda** rights by Trooper McDevitt.

5. The Defendant then made the statement, "maybe I should talk to a lawyer. What good would it do me to tell you?"

6. The trooper responded, "[I] really don't know what

good it would do. The only thing is I would tell the District Attorney you cooperated for whatever good that would be, but I would have no idea whether it would help your case or not."

7. The Defendant was then asked if he was under the influence of alcohol or drugs.

8. His response was "no".

9. The Defendant then confessed to the killing of George Mehl.

10. . . . .

11. John F. Canavy was a State Policeman employed by the Pennsylvania State Police.

12. Trooper Canavy was present for part of Trooper McDevitt's interview of the Defendant.

13. Trooper McDevitt left the room.

14. The Defendant requested to call his lawyer.

15. The Defendant called his father instead of a lawyer.

16. The trooper stood three to four feet away.

17. The Defendant stated "they got me up at the State Police barracks for killing that guy", "You know the one", "Never mind that silly shit." "I want to tell you what to do with my motorcycle." "It's worth a lot of money" and "It will be a long time until I get out of jail."

18. Exactly when during the interview this phone call took place is inconclusive from the testimony.

19. The interview was then brought to a close.

20. The Defendant then awaited his transportation to the Pike County Jail.

21. The Defendant then stated, "Why don't you like me" to Trooper McDevitt.

22. Trooper McDevitt's response was, "Why did you say that."

23. The Defendant continued, "Well, George was a friend of yours, wasn't he?"

24. The trooper stated, "Yes, but I can't let that interfere with my job."

25. The Defendant ended with, "But I killed him."

26. The Defendant was placed in the patrol car to be transported to the Pike County Jail.

27. En route to the jail without any police questioning or conversation the Defendant made the following remarks.

    "I am up shits creek without a boat."
    "I pulled the trigger but I didn't kill him."
    "I would have backed up, but I was afraid of being called a chicken."

28. The trooper did not respond or comment to any of the Defendant's remarks.

Trial Court Opinion, 12/9/93, at 13-15 (citations to record omitted). While the trial court concluded that the statements made by Appellant on the telephone to his father had not been purged of the taint of inducement, the statements volunteered thereafter were properly admitted.

(Doc. 31-45 at 6-9, Pa. Super. Op.)

On direct appeal following the third trial, the Pennsylvania Superior Court rejected Petitioner's argument, and found that the law of the case doctrine did not prohibit the admission of all the incriminating statements made by Petitioner to the police. The state court found that the Pennsylvania Supreme Court's pronouncement in Gibbs was limited to the confession obtained at the police barracks, relating specifically to the interrogation of Petitioner conducted at the barracks. The court pointed out that the Supreme Court did not mention the volunteered statement made after Petitioner had been afforded a call to his attorney, and after all questioning had stopped. Moreover, it was further noted that the Supreme Court did not engage in any discussion with respect to the concept of "the fruit of the poisonous tree" or whether Petitioner's "blurted statements had been cleared of the primary taint of improper ." (Doc. 31-45 at 9, Super. Ct. Op.)

It was the finding of the Superior Court on direct appeal that the legal question presented to the trial court of whether the volunteered statements made after interrogation had ceased at the police barracks and after Petitioner was allowed to call his attorney were infirm, was not decided by the Pennsylvania Supreme Court. The latter statements were made after Petitioner's invocation of his right to counsel were honored and after all police questioning had ceased. As such, the application of the law of the case doctrine was not applicable here.

2. Analysis

Respondent seeks the dismissal of Petitioner's argument on the following procedural grounds: (1) failure to frame the issue as a federal claim but rather only one of state law; (2) failure to "fairly present" the law of the case issue as a federal claim to the state courts; and (3) because the claim was disposed of by the state courts based upon an independent and adequate state law ground.

Without unnecessary elaboration, even assuming that Petitioner had framed this issue as a federal claim and fairly presented it to the state courts, the record demonstrates that the state courts addressed and disposed of the issue based upon a state ground independent of the federal issue and adequate to support the judgment. See Lambrix v. Singletary, 520 U.S. 518, 522 (1997). The state courts determined as a matter of state law that the law of the case doctrine did not extend the Pennsylvania Supreme Court's decision in Commonwealth v. Gibbs, 553 A.2d 409 (Pa. 1989), to require the suppression of additional admissions made by Petitioner after his custodial interrogation had concluded. As such, an independent and adequate state law basis existed and precludes review by this court.

**D.    Improper conviction and sentenced twice for a single conspiracy**

1. Relevant facts

In his fourth ground, Petitioner alleges that he was improperly convicted and sentenced twice for a single conspiracy. He claims that the prosecution presented

evidence of a single conspiracy with multiple objectives aimed at a single goal.

However, he was convicted and given consecutive sentences for two conspiracies

which involved the same co-defendants, overt act, ultimate goal and occurred on the

same evening at the same time. (Doc. 1, Pet. at 13.) The gist of Petitioner's argument

is that to be convicted of and sentenced for two counts of conspiracy (conspiracy to

murder Mehl and conspiracy to commit the aggravated assault of Burke), the

Commonwealth must prove that Petitioner entered into two separate agreements.

Otherwise, the protection against double jeopardy is violated. He also relies on the

trial court's remarks that there was only a single conspiracy charge for murder and

aggravated assault. (Doc. 2, Pet'r Mem. at 28.)

This issue was presented to the Pennsylvania Superior Court on direct appeal.

The state court found that when determining the sufficiency of the evidence, "we

view all the evidence admitted at trial in the light most favorable to the

Commonwealth as verdict winner, and draw all reasonable inferences in its favor."

Commonwealth v. Koehler, 914 A.2d 427, 435-36 (Pa Super. 2006). In addressing

Petitioner's claim, the Superior Court found as follows:

> Section 903(c) of the Crimes Code, which defines conspiracy, states, "If a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship." 18 Pa.C.S. § 903(c). Thus, to sustain Appellant's convictions for two counts of conspiracy, there must be a separate agreement or conspiratorial relationship to support each conspiracy conviction. **Commonwealth v. Barnes**, 871 A.2d 812 (Pa. Super. 2005).

In determining whether a single conspiracy or multiple conspiracies have been established, we must consider several relevant factors:

> The factors most commonly considered in a totality of the circumstances analysis of the single vs. multiple conspiracies issue are: the number of overt acts in common; the overlap of personnel; the time period during which the alleged acts took place; the similarity in methods of operation; the locations in which the alleged acts took place; the extent to which the purported conspiracies share a common objective; and, the degree to which interdependence is needed for the overall operation to succeed.

**Commonwealth v. Davis**, 704 A.2d 650, 654 (Pa. Super. 1997).

**Id**. at 820. (Emphasis in original.)

In the present case, the Commonwealth's evidence was sufficient to establish the existence of two different conspiracies, one to murder Mr. Burke and the other to harm Mr. Mehl if it became necessary to shoot Mr. Burke. The objective of the first conspiracy was Mr. Burke's murder. This conspiracy started in February 1984 and continued until the evening of the actual shooting, March 27, 1984. Over the two months preceding the shooting, when only Mr. Burke's murder was being planned, discussions occurred among Sharon Burke, Bonnie Hagan-Sullivan, and Hagan-Sullivan's boyfriend, Gary Huth, and her friends, Connie Stein and Jennie Dean. The active participants in this conspiracy were Sharon Burke, Hagan-Sullivan, and Dean. Conversations with Appellant concerning the planning and execution of Mr. Burke's murder occurred on the telephone, at Sharon Burke's home, and at a business establishment. There was an overt act in furtherance of this conspiracy when Appellant conducted target practice at the Burke residence the day before the shooting.

The second conspiracy had a completely different motive and objective, to harm Mr. Mehl. That conspiracy was not formed until March 27, 1984, long after the agreement to kill Mr. Burke was in place and only

35

when it became apparent that Mr. Mehl was going to be present with Mr. Burke at work. The discussions over what to do about Mr. Mehl occurred only between Sharon Burke and Appellant and were conducted at the Burke home and in the car on the way to Hemlock Farms.

Thus, the conspiracies involved: 1) different victims, Mr. Burke and Mr. Mehl; 2) different objectives, to kill Mr. Burke and to harm Mr. Mehl; 3) different co-conspirators; 4) different time frames; and 5) different locations for the agreements. Thus, the evidence, viewed in the light most favorable to the Commonwealth was sufficient to sustain Appellant's conviction of two counts of conspiracy.

(Doc. 31-45 at 12, Pa. Super. Op.)

In determining whether the state court determination that the evidence was sufficient to convict Petitioner of two counts of conspiracy is contrary to clearly established Federal law, the court is mindful that the standard of review used by a federal court to address a sufficiency of the evidence claim is "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, reh'g denied, 444 U.S. 890 (1979)(emphasis in original). Although direct evidence may be more probative of a fact, circumstantial evidence alone may suffice for a finding of guilt beyond a reasonable doubt. Id. at 324-25. Moreover, the credibility of witnesses, the resolution of conflicts of evidence, and the drawing of reasonable inferences from proven facts all fall within the exclusive province of the fact finder, and therefore, are beyond the scope of federal habeas review. Id. at 309.

The standard applied by the Pennsylvania Superior Court in reviewing Petitioner's sufficiency of the evidence claim on direct appeal, as articulated in Pennsylvania case law, is consistent with the standard set forth in <u>Jackson</u>. Further, the rejection by the state court of Petitioner's sufficiency of the evidence claim was objectively reasonable as illustrated by the evidence existing in the record and cited to by the state court that supported the existence of two separate conspiracies - including different objectives, different parties, different locations and different times. For these reasons, the court finds that the state court determination was not contrary to, or an unreasonable application of, clearly established Federal law, and also was not based on an unreasonable determination of the facts in light of the evidence presented. Consequently, there is no basis to grant federal habeas relief to Petitioner on this claim.

### E. Trial court punished Petitioner for having filed a successful habeas petition by increasing sentence by 5-10 years after third trial

#### 1. Relevant facts

In the fifth ground raised in the pending habeas corpus action, Petitioner claims that the trial court punished him for filing an earlier successful federal habeas corpus petition by increasing his sentence following the third trial by 5-10 years. Petitioner argues that following his second trial in 1994, he was sentenced to the maximum of 20 to 40 years imprisonment and that the trial court made a ruling that there was only

once conspiracy in this case. He claims that he thereafter successfully petitioned for a writ of habeas corpus. Following his third trial in which no new evidence was presented, and without any reasons for the increase, he claims the trial court vindictively imposed a greater penalty increasing his sentence from 20-40 years to 25-50 years due to his successful habeas petition.

2. Analysis

To comply with the exhaustion requirement of 28 U.S.C. § 2254, Petitioner was required to present all of his federal habeas claims to the Pennsylvania courts in his direct appeal or in a PCRA proceeding. He only filed a direct appeal and did not seek relief through a PCRA proceeding brought in accordance with the Post Conviction Relief Act. See 42 Pa. Cons. Stat. § 9542. The time for pursuing PCRA relief has long expired in that any PCRA petition was required to be filed within one (1) year of the date the judgment became final. See 42 Pa. Cons. Stat. § 9542(b)(1). The Supreme Court of Pennsylvania has held that the PCRA's timeliness requirements are mandatory and jurisdictional in nature; thus, no court may properly disregard or alter them in order to reach the merits of the claims. See e.g., Commonwealth v. Murray, 562 Pa. 1, 5, 753 A.2d 201, 202-03 (2000); Commonwealth v. Fahy, 558 Pa. 3113, 328-29, 737 A.2d 214, 222 (1999).

While Petitioner did file a direct appeal wherein he raised claims challenging the sentence imposed by the trial court, he failed to raise any claim challenging the

sentence on the basis of the trial court's vindictiveness under North Carolina v. Pearce, 395 U.S. 711 (1969). In reviewing Petitioner's brief filed on direct appeal, the sentence is challenged on grounds including (1) that it exceeded the standard and aggravated ranges for conspiracy to commit murder, conspiracy to commit aggravated assault and aggravated assault; (2) that the court failed to demonstrate on the record which edition of the Sentencing Guidelines it considered and state why the crimes committed were more severe than normal crimes of these type; (3) that the court failed to consider such factors as Petitioner's age, lack of prior contact with the criminal system and abuse of drugs and alcohol; and (4) that the court improperly considered the Commonwealth's allegation that Petitioner committed a "contract killing." (Doc. 31-39, App. S, Pet'r Pa. Super. Br. at 6.) At no point in his brief does Petitioner ever set forth a ground of sentencing vindictiveness by the trial court. This is further evidenced by the scope of the Pennsylvania Superior Court's opinion in response to the direct appeal that does not list any vindictiveness ground as raised by Petitioner. As such, this ground has not been fairly presented to the state courts and is procedurally defaulted.

As stated previously, this federal court may not review Petitioner's defaulted claims unless he demonstrates cause and prejudice for his default or establishes a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000). To satisfy the cause standard, a petitioner must demonstrate that some objective factor

external to the defense impeded his or her efforts to raise the claim in state court. McCleskey v. Zant, 499 U.S. at 493 (1991); Murray v. Carrier, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must demonstrate that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions, not merely that the error created a "possibility of prejudice." Carrier, 477 U.S. at 494.

Petitioner neither argues cause and prejudice nor the existence of a fundamental miscarriage of justice in his petition. Consequently, Petitioner is not entitled to habeas corpus relief with respect to this ground.

For all of the foregoing reasons, the instant petition for habeas corpus will be denied.

## V. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322 (2003). In

the instant matter, jurists of reason would not find the disposition of Petitioner's case debatable. As such, no COA will issue.

An appropriate order follows.